Richard J. RICHARDS, Plaintiff-Appellant,

v.

GOERG BOAT AND MOTORS, INC., Kenner Boat Company, a Division of A. J. Industries, Inc., and Citizen's Bank of Michigan City, Indiana, Defendants-Appellees.

No. 3-376A58.

Court of Appeals of Indiana, Third District.

Jan. 18, 1979.

Rehearing Denied March 5, 1979.

Gordon A. Etzler, Clifford, Hoeppner, Houran, Wagner & Evans, Valparaiso, for plaintiff-appellant.

Anthony W. Rosinia, Michigan City, for defendant-appellee Goerg Boat and Motors, Inc.

Leon R. Kaminski, Edward L. Volk, Newby, Lewis, Kaminski & Jones, La Porte, for defendant-appellee Kenner Boat Co.

John T. Mulvihill, South Bend, for defendant-appellee Citizen's Bank of Michigan City, Indiana.

HOFFMAN, Judge.

This is an appeal from a summary judgment entered against plaintiff-appellant Richard J. Richards on his complaint for damages for breach of warranties, both express and implied, arising from the sale of a 47-foot houseboat to Richards for use on Lake Michigan by defendants-appellees Goerg Boat and Motors Inc., the dealer, and Kenner Boat Company, a division of A. J. Industries, Inc., the manufacturer.

Richard J. Richards, a small truck fleet operator, became interested in the purchase of a houseboat having viewed a particular model in magazines and at the Chicago boat show. He discussed his interest in the possible purchase of a houseboat known as a Suwanee 47 with Carl Ellison, the president of Goerg Boat and Motors Inc., a dealership in Michigan City, Indiana. He thereafter attended a dealer show for which Ellison had given him tickets. Richards was pleased with the information he received from Kenner people at the show but he was reluctant to make the financial commitment required of a production model. Accordingly, Ellison made inquiries with Kenner Boat Company for a used or demonstrator Suwanee 47. Upon this request an offer to sell containing a description of the boat was made by Kenner through Goerg. The offer was made by Goerg because the purchase had to be made through a dealer. Ellison arranged a trip to Arkansas where Richards was to visit the Kenner factory and make an inspection of the houseboat. In connection therewith Richards used the proposi-

tion from Kenner describing the boat. Appellant made the trip in October of 1968 with a personal friend who was experienced in the amateur appraisal of boats.

Upon arrival at the Kenner Boat Company, Richards and his friend met Joe Carver, a salesman, who showed him through the plant describing their production method of using hand laid up fiberglass. The threesome then made a visual inspection of the boat noting defects described on the proposition. There was also a further inspection of that portion of the bilge area which was visible through the center compartment. At that time there was no rot, dampness or deterioration. Carver then took Richards and his friend for a ride, crossing the wake wave and exhibiting the controls and operation of the boat. Richards operated the vessel himself for a time. Carver in his deposition stated that the boat was for sale "as is," that it could be used on inland lakes and rivers, that there would be no warranty and that there were possibly problems with cracks in the cabin fiberglass.

Upon returning to Michigan City, Richards gave a deposit to Goerg Boats through Mr. Ellison, in order to have the boat delivered the following March. In March of 1969 Richards received a telephone call that the boat had been delivered to Goerg. He went to the marina several days later and discovered that water was being pumped out of the hull. The hull was scratched, the wooden doors were warped, the curtains were discolored, mildew was on the carpeting, and the paneling had delaminated. There were also external cracks in the fiberglass on the decks, the cabin and around the windows. Ellison went over the boat with Richards and called Kenner, notifying them of the water damage and defects. Ellison made a list of defects which were to be fixed and Kenner authorized Goerg to make the repairs. However, Mrs. Ellison, the secretary-treasurer for Goerg, feeling that the boat was at the time of delivery not in a saleable condition, entered a stop-

payment order with their bank, the Citizen's Bank of Michigan City, on Goerg's check to Kenner.[1]

Simultaneously, Richards proceeded with his own work attempting to commission the vessel while repairs were being made. While so engaged he discovered approximately 20,000 pounds of water throughout the various hull compartments. Ellison notified Kenner of the situation. Carver flew to Michigan City where his inspection confirmed Richards' complaints about the hull. At that time Richards told Carver that he wanted to return the boat and that he would not pay the balance until everything was fixed. While at lunch with Richards and Mrs. Ellison, Carver assured Richards not to worry; they would make the boat right. Mrs. Ellison stated in her deposition that she was unhappy with Carver's perception of the problem since she thought the vessel was represented as being seaworthy when, in fact, it was not. However, Richards allowed further work to be done. After one of the engines refused to start, Goerg made additional repairs including extensive repositioning of fuel tanks. Subsequently, the windows were discovered to be inadequate and were removed to permit refastening with screws. New cracks developed in the cabins. Rain continued to leak in. Richards made additional calls to Kenner about the defects and expressed dissatisfaction with Georg's repair work. Kenner sent two special repairmen from Arkansas. Richards worked with these individuals for two weeks. They recovered the cabin with fiberglass and made repairs to the cracks. However, after completing their work they said the boat was unsafe for use on the lake. Richards told them he did not want the boat. There followed a discussion about returning the boat but Richards did not follow through because he still liked the design concept of the vessel.

Although further work had to be performed on the engines and outdrives, the

---

1. Acknowledgment from the bank was returned on April 4, 1969. When the bank honored the check to Kenner despite the stop-payment order the controversy between Goerg and the Citizen's Bank ensued and became an issue at trial. However, its resolution was not raised as a matter on appeal.

repair work done by the factory representatives made the vessel appear to be in good condition. Thus, on the Fourth of July weekend Richards took the boat on its first outing across Lake Michigan through the waterway to Starved Rock on the Illinois River. During the trip one engine stalled and the windows leaked some rainwater. New cracks began to appear. After the trip Richards was still unsatisfied, feeling the boat was essentially unsafe in that it gave the "appearance of breaking up." Nevertheless, Ellison put considerable pressure on him to pay the balance which he did under protest and on the condition that he receive a warranty. A check for $9,412.10 was given to Goerg on July 12, 1969, when Richards simultaneously received a written express warranty on the hull from Kenner. At that time a bill of sale and a carpenter's certificate from Kenner were issued evidencing the transfer of title. After further assurances from Ellison, Richards decided to go ahead with his previously planned vacation trip on the houseboat.

That trip involved taking some Sea Scouts to Mackinac Island, Michigan where Richards would meet his wife. On the outbound trip Richards experienced excessive working in the hull. Rainwater leaked in and cracks began to appear. While on return from the island in the Straits of Mackinac one of the four main stringers broke loose from the hull and the rear window broke out. Richards returned to harbor. Two inspectors found that the bow skeleton had broken loose from the fiberglass skin, so Richards decided that the boat was unsafe to return with his passengers.

Richards called Goerg and talked to Mrs. Ellison. He explained the defects and expressed his dissatisfaction with the houseboat. Mrs. Ellison felt it was unsafe. Accordingly, at Mackinaw City, Michigan, several heavy items were removed to lighten the boat and the passengers were put ashore. After weighing the alternatives Richards decided to return the boat himself to Michigan City. Ellison said he would deal with Kenner, that the season would soon be over and that Goerg would take care of the boat. Richards wrote an extensive letter to Mr. Kenner which notified him of the problems on the trip. Goerg removed the boat from the water. Negotiations were begun to replace a production model for the prototype plus $5,000 and freight. However, Richards refused the arrangement because Kenner would not provide a warranty with a new production boat. Thereafter the boat sat at Goerg's.

Two years later in 1971 the houseboat was sold by Goerg and Richards through a broker to a buyer in Chicago, Illinois. Ellison's attorney helped to make the arrangements, the check being paid from Vernon Larson to Goerg for the purchase. Richards eventually received the net proceeds from that sale.

On April 14, 1970, Richards filed his complaint against Goerg alleging, *inter alia,* that the dealer had breached implied warranties of merchantability, breached express warranties that the boat was of sound material and workmanship and breached the implied warranty of fitness for a particular purpose, that is, for use upon Lake Michigan. Richards further alleged his revocation of acceptance of the boat and prayed for judgment against Goerg for the purchase price coupled with incidental and consequential damages.

Goerg filed an answer to Richards and cross-claimed against Kenner and the Citizen's Bank of Michigan City, Indiana. The dealer alleged as to Kenner that the boat was manufactured with structural and material defects resulting in a breach of its express warranty thereby incurring damages to Richards for which Goerg should be indemnified. As previously noted, Goerg's third party cross-complaint against Citizen's Bank alleged breach of contract for failure to honor a stop-payment order on a check issued to Kenner for payment of the boat.

On July 3, 1970, Richards obtained leave of court to add Kenner as a party defendant and filed paragraph 2 of its complaint against Kenner as manufacturer, alleging that the transfer to Goerg was under expressed and written warranties with knowledge that Richards was the ultimate con-

sumer of the boat and that the warranties were to be extended to Richards as a result. A subsequent additional claim, denominated amended complaint, was made by Richards against Kenner alleging misrepresentation and fraud.[2]

After pretrial discovery Goerg and Kenner moved for summary judgment. Upon the basis of the affidavits and depositions before it, the trial court entered judgment against Richards. In its ruling in favor of Goerg the trial court noted among other things that Goerg had made no express warranties, that the boat was a used demonstrator sold "as is" at a reduced price, and that Richards made a thorough inspection with an expert. Further it found that the express warranty of Kenner's excluded any implied warranties and that the plaintiff irrevocably accepted the boat.

As to Kenner's motion for summary judgment the trial court ruled that the manufacturer did not negotiate the sale of the boat nor did it have a contract of sale with Richards, that the exclusive express warranty was for one year after March 26, 1969, that Richards failed to comply with its terms, and that having purchased the used prototype for ⅓ off the production model he had demonstrated that there was no implied warranty operating between the parties. Furthermore, the court noted, that with no injury to the plaintiff's person or property, a lack of privity precluded his claim against a remote manufacturer.

Appellant attacks these summary judgments on appeal contending that there are material issues of fact as to the intention of the parties to the sales contract and that the understanding by the parties of both express and implied warranties were in conflict.

■■■■ The standard this Court applies in reviewing the grant of a summary judgment motion is the same as that applied by the trial court. *Hale v. Peabody Coal Company* (1976), Ind.App., 343 N.E.2d 316. A summary judgment is only proper when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Ind.Rules of Procedure, Trial Rule 56(C). Moreover, this Court must reverse the grant of a summary judgment motion if the record discloses an unresolved issue of material fact or an incorrect application of the law to those facts. Finally, a fact is "material" for purposes of summary judgment if it facilitates resolution of any of the issues either for or against the party having the burden of proof on that issue. *Brandon v. State* (1976), Ind., 340 N.E.2d 756. In this context, Richards' first issue as to both appellees is whether the trial court erred in finding no facts from which a claim for implied warranty against them could be obtained.

■■■■ Any action based on breach of warranty requires evidence showing not only the existence of the warranty but that the warranty was broken and that the breach of warranty was the proximate cause of the loss sustained. Thus, the goods must have been shown to have been defective in contravention of the warranty and such defects must be attributable to the seller.

Under the Uniform Commercial Code as enacted in Indiana, IC 1971, 26–1–1–101 *et seq.* (Burns Code Ed.), there are two implied warranties, that of merchantability and that of fitness for a particular purpose.[3]

2. As a preliminary matter on appeal Goerg attempts to foreclose further action against it on grounds that Richards' amended complaint made no claim nor prayed for any damages as to it. However, upon Goerg's earlier motion to dismiss predicated on the foregoing, the trial court ruled in favor of Richards. The complaint was treated as having three paragraphs filed separately, one concerning Goerg and two concerning Kenner. Moreover, the pleading in question specifically included Goerg and referred to the previous filings as if they were appended. Since the trial court dealt with the

issues of implied warranty as to Goerg in its ruling on appellees' motion for summary judgment and since the pleading was apparently considered as the third paragraph of a three part complaint for purposes of the prior motion to dismiss, it will not be considered otherwise on appeal. Therefore Richards preserves his allegations of error regarding the legal issues of warranty as to the dealer.

3. IC 1971, 26–1–2–314 (Burns Code Ed.). IC 1971, 26–1–2–315 (Burns Code Ed.).

Strictly speaking these warranties are not contractual or promissory but rather arise out of the status relationship between a buyer making a purchase from a seller; that is, they arise because the seller happens to be a merchant or has knowledge about the buyer's purpose and reliance. Moreover, since they are imposed by operation of law for the protection of the buyer, it has been held that implied warranties must be liberally construed in favor of the buyer. *Woodruff v. Clark Co. Farm Bureau* (1972), 153 Ind.App. 31, 286 N.E.2d 188.

IC 1971, 26–1–2–314 (Burns Code Ed.) provides:

"(1) Unless excluded or modified (section [26–1–]2–316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. Under this section the serving for value of food or drink to be consumed either on the premises or elsewhere is a sale.

"(2) Goods to be merchantable must at least be such as

(a) pass without objection in the trade under the contract description; and

(b) in the case of fungible goods, are of fair average quality within the description; and

(c) *are fit for the ordinary purposes for which such goods are used;* and

(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and

(e) are adequately contained, packaged, and labeled as the agreement may require; and

(f) conform to the promises or affirmations of fact made on the container or label if any.

"(3) Unless excluded or modified (section [26–1–]2–316) other implied warranties may arise from course of dealing or usage of trade."

Within the framework of the instant case the minimum standard of merchantability concerns whether the product is fit for the ordinary purpose for which it is used; does it meet the general description of a used serviceable prototype houseboat.

The second implied warranty embodied in IC 1971, 26–1–2–315 (Burns Code Ed.) provides:

"Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

Under its provisions the seller must have reason to know the particular purpose for which the goods are purchased and that the buyer is relying on the seller's skill in selecting the product for his use.

Appellant focuses on both of these implied warranties arguing that the defects in the houseboat were so substantial as to render it unfit for its ordinary purpose and, in addition, unfit for its particular purpose, use on Lake Michigan, which was known to the seller. Therefore appellant contends that the trial court erred in finding no implied warranties of merchantability or of fitness for a particular purpose inuring to plaintiff as a buyer of goods from Goerg, the seller, and Kenner, the manufacturer.

In response, both appellees attempt to avoid the status relationship of seller in the transaction. As to Goerg an argument is made that it was merely a broker between Kenner and Richards and did nothing more then handle the dollar value involved. However, the record clearly discloses that Goerg was a dealer for Kenner and that as such it was engaged as a "merchant" in the sale of boats and motors. Ellison, as president of Goerg, was aware of Richards' essential needs with regard to a houseboat, having arranged for his visit to the boat show and later to Arkansas. Moreover, Ellison knew of Richards' plans to use the houseboat on Lake Michigan. This knowl-

edge is indicated by discussion between the parties concerning the type of houseboat, a place to keep it and the trade-in of Richards' old boat.

A converse argument is made by Kenner in which it asserts that it was the manufacturer and not the seller and that no privity of contract existed between itself and the buyer. Accordingly, without the strict liability in tort which might arise from an injury to person or property it is argued that Richards' traditional warranty claim against the manufacturer should fail.

■■ Generally privity extends to the parties to the contract of sale. It relates to the bargained for expectations of the buyer and seller. *Dagley v. Armstrong Rubber Company* (7th Cir. 1965), 344 F.2d 245. Accordingly, when the cause of action arises out of economic loss related to the loss of the bargain or profits and consequential damages related thereto, the bargained for expectations of buyer and seller are relevant and privity between them is still required. White and Summers, Uniform Commercial Code 1972 Ed.

■ Implied warranties of merchantability and fitness for a particular use, as they relate to economic loss from the bargain, cannot then ordinarily be sustained between the buyer and a remote manufacturer. *Gregory v. White Truck & Equipment Co., Inc.* (1975), Ind.App., 323 N.E.2d 280.

■ In the case at bar, however, there are factors which should be considered sufficient to bring Kenner into the transaction directly as a seller. *See: Randy Knitwear, Inc. v. American Cyanamid Company* (1962), 11 N.Y.2d 5, 226 N.Y.S.2d 363, 181 N.E.2d 399. Except for the direct exchange of payment, the relationship between Richards and Kenner involved all of the attributes of a sales transaction relevant to the warranty. Richards talked with the Kenner people at the boat show. He went for the demonstration and inspection ride at their plant. He dealt directly with them concerning problems with the boat and the corrective measures to be taken. Carver went to Michigan City and directly assured

Richards in order to consummate the sale. Finally Richards received the carpenter's certificate and warranty upon final payment to Kenner. From the foregoing it must be concluded that Richards and Kenner Boat Company had a direct relationship involving the contract of sale. *Thompson Farms v. Corno Feed Products, etc.* (1977), Ind.App., 366 N.E.2d 3.

Thus, in the absence of undisputed evidence that the implied warranties of merchantability and fitness for a particular purpose had been modified or excluded by agreement, the implied warranties would have remained in force and available to Richards because both appellees must be considered sellers under the Code. *Woodruff v. Clark Co. Farm Bureau, supra.* Attention must therefore be given to the exclusions and modifications of implied warranties available to a seller under IC 1971, 26–1–2–316 (Burns Code Ed.).

IC 1971, 26–1–2–316 states:

"Exclusion or modification of warranties.—

"(1) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article [chapter] on parol or extrinsic evidence (section [26–1–]2–202) negation or limitation is inoperative to the extent that such construction is unreasonable.

"(2) Subject to subsection (3), to exclude or modify the implied warranty of merchantability or any part of it the language must mention merchantability and in case of a writing must be conspicuous, and to exclude or modify any implied warranty of fitness the exclusion must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.'

"(3) Notwithstanding subsection (2)

(a) unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is,' 'with all faults' or other language which in common understanding calls the buyer's attention to the exclusion of warranties and makes plain that there is no implied warranty; and

(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him; and

(c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade.

"(4) Remedies for breach of warranty can be limited in accordance with the provisions of this article [chapter] on liquidation or limitation of damages and on contractual modification of remedy (sections [26–1–]2–718 and [26–1]2–719)."

Relying on the foregoing it is argued by appellees that there were no implied warranties in effect by virtue of the course of dealing between the parties. Specifically, it is said that Richards knew the boat was a used prototype for which he paid one third less than for a production model and that he was taking it "as is" after a complete inspection. Finally, both appellees assert the written proposition and the manufacturer's written warranty as containing effective disclaimers of implied warranties from the dealer to the buyer.

Richards disputes each of these potential areas of modification or disclaimer on appeal. They are considered individually in the following manner:

■ The "course of dealing"[4] discloses a contract initiated through the manufacturer for the sale of a used prototype house-

boat in order that Richards could avoid the higher cost of a production model. The prototype status of the Suwanee 47 was understood by all of the parties to have been less than a production model. While IC 1971, 26–1–2–314 makes no specific distinction between the sale of new and used articles, the official comments state that "a contract for the sale of secondhand goods . . . involves only such obligation as is appropriate to such goods for that is their contract description." Accordingly, inspection and course of dealing between the parties concerning the used product and its characteristics are relevant to the circumstances herein under IC 1971, 26–1–2–316(3)(b), *supra.* If the buyer makes an examination and the examination would bring to his notice the existence of the defect complained of on an obviously used product, the buyer cannot be heard to complain on grounds of breach of an implied warranty. Rather, by asking to inspect a used item and therefore by making an examination of it, the buyer is put on notice that he is assuming the risk of any defects which the examination should reveal.

■ In so far as Richards made an examination which would have disclosed the defects he later alleged, he was within IC 1971, 26–1–2–316(3)(b) and no implied warranty of merchantability or fitness for a particular purpose would be sustainable as to those defects. On this basis defects regarding the cabins, cracks appearing in the "gel-coat," and interior water damage which can be considered readily observable during the Arkansas inspection, were known to the buyer and therefore excluded under IC 1971, 26–1–2–316(3)(b).

However, as appellant correctly argues, such a result would not pertain to latent defects inhibiting the general use of the boat. They will not be excluded by a simple type of examination nor will those defects which would require an unusual examination obviously beyond the capabilities of

4. IC 1971, 26–1–1–205 defines course of dealing as:

"[A] sequence of previous conduct between the parties to a particular transaction which

is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct."

the buyer. U.C.C. § 2–314, Official Comment 8; *See: Nettles v. Imperial Distributors Inc.* (1968), 152 W.Va. 9, 159 S.E.2d 206. Thus, while appellees seek refuge in IC 1971, 26–1–2–316(3)(b), as to defects in the used prototype houseboat which were discoverable, no such inspection requirement can overcome those structural defects which are considered latent, i. e., those defects in the hull or those defects which make the boat unseaworthy or not fit for its particular purpose. Accordingly, where the facts are in controversy concerning latent defects, summary judgment on that basis must be considered inappropriate in determining whether implied warranties of merchantability or fitness for a particular purpose were violated.

■ Nevertheless, Goerg and Kenner consider the sale to have been "as is" and excluded from any implied warranties under IC 1971, 26–1–2–316(3)(a). In connection with this argument they rely on the written description or proposition used by Richards on his inspection trip containing the words "as is." In that document several assertions were made about the quality of the houseboat including the following:

"The hull is in excellent condition; the color is dark blue. The superstructure is made of plywood covered with glass—not a molded glass superstructure as is on the production models. The general condition of the boat is excellent. The interior is like new and so are the furnishings. The wall covering in the aft stateroom could use a little glue in a spot or two. Dampness has caused some slight damage to the plywood lower panel of the door. The sliding doors are wood and not aluminum.

"The boat has a one year warranty on the hull and the warranty on the engine is still good. It has hand operated marine heads and we will sell as is. It is not equipped for dock-side discharge."

IC 1971, 26–1–2–316(3)(a) (Burns Code Ed.), specifically provides that "unless the circumstances indicate otherwise, all implied warranties are excluded by expressions like 'as is' . . . which in common

understanding calls the buyer's attention to the exclusion of warranties." However, this type of exclusion so framed is inoperative as to the defects as alleged in the case at bar.

First, under *Woodruff v. Clark Co. Farm Bureau, supra,* this Court has held that for the "as is" language to operate as a disclaimer of all implied warranties, it must be conspicuous as defined in IC 1971, 26–1–1–201 (Burns Code Ed.) and as used in IC 1971, 26–1–2–316 *supra.* The language here in question is not conspicuous within that definition.

Second, upon analysis of the juxtaposition of the "as is" language with the hand operated marine heads in the description, it must be concluded that the terms "as is" pertain solely to the marine toilets and perhaps by way of explanation to the absence of discharge capabilities for dock side use.

Such an interpretation is required by the previous statement that there is an express one-year warranty concerning the hull and the statement that the "general condition of the boat is excellent." These when read as "consistent with each other and as cumulative" confirm a specific express warranty without denying a general implied warranty. *See:* IC 1971, 26–1–2–317 (Burns Code Ed.). Further argument that Joe Carver, salesman for Kenner, told Richards at the time of his inspection that the boat was being sold "as is" presents nothing more than conflicting evidence of what the parties understood. Richards specifically states the opposite which is corroborated by the writing. Thus, the "as is" defense sought under the description with regard to IC 1971, 26–1–2–316(3)(a), *supra,* is unsupportable as a disclaimer of implied warranties about the structure of the hull.

In considering these asserted defenses to an implied warranty of merchantability it must be concluded that only certain attributes of the boat were known to be defective and therefore outside the ambit of such implied warranty. While Richards' inspection in Arkansas disclosed defects in the cabin, including cracks on its surface and while the proposition noted the fiberglass

over wood construction of the cabin, which together would negate implied warranties as to those attributes, it remains that the same cannot be said for the alleged defects in the hull structure. No evidence was presented that the implied warranties concerning a seaworthy hull had been excluded. Therefore certain factual elements remain in dispute concerning whether Goerg or Kenner, in fact, breached the implied warranties of merchantability as to the seaworthiness of the boat.

Moreover, a material issue of fact exists as to whether an implied warranty of fitness for a particular purpose ever property arose. Evidence concerning the seller's knowledge of the buyer's reliance is conflicting. Without having been properly disclaimed under IC 1971, 26–1–2–316, *supra,* as herein noted nor clearly denied for a failure of evidence, summary judgment denying this type of warranty claim is similarly inappropriate. *See: Catania v. Brown* (1967), 4 Conn.Cir. 344, 231 A.2d 668.

Drawn into question then is the relationship between the implied warranties available to Richards as to the seaworthiness of a prototype boat and the express warranties issued by Kenner the manufacturer. Two specific written express warranties were made. In addition to the foregoing language in the proposition that "the hull is in excellent condition" and that "the boat has a one year warranty on the hull" the following warranty was issued to Richards by Kenner upon his final payment.

"THE GLASS HULL # 57 WHICH WAS USED TO BUILD TRI–CABIN PROTOTYPE # 47–68–1 is guaranteed to be free from defects in material and workmanship under normal use and services. The obligation under this warranty being limited to hull only for repairing or replacing at the factory any part or parts which shall, within 1 year of date of original purchase, be returned to us with transportation charges prepaid and which our examination shall disclose to our satisfaction to have been defective. This warranty being expressly in lieu of all other warranties and representations in connection with the sale or use of this product. Hull damage due to accident or gross neglect is not covered by this warranty. Date of purchase of this hull was 3/26/69. KENNER BOAT COMPANY"

Both Goerg and Kenner assert language in this written warranty as disclaiming any implied warranty. Further, Goerg focuses on the fact that the trial court found that this specific written warranty, being a separate document distinct from the sales order, was issued in lieu of all other warranties and representations in connection with the sale.

Appellant in response urges two arguments with respect to the written manufacturer's warranty. Richards first contends that the trial court erred in finding applicable disclaimer language in the manufacturer's written warranty as to either defendant. Concerning Goerg, appellant argues that whatever written warranty there was is not the basis of the bargain between himself and the dealer. As to Kenner he urges that the disclaimer was inconspicuous in relation to all prior express warranties. Second, appellant argues that the express warranty should be read as cumulative with other written and oral express warranties because the latter are consistent with the implied warranties.

An express warranty is a contract between the buyer and seller and in order for the buyer to set forth a cause of action based thereon it is essential that it be demonstrated that both parties understood and agreed to the same thing. *Atlanta Tallow Co. v. John W. Eshelman & Sons, Inc.* (1964), 110 Ga.App. 737, 140 S.E.2d 118.

As a result the seller of goods covered by the manufacturer's written warranty may adopt such written warranty as his own if, by his conduct at the time of the sale, he had made an affirmation about the written warranty with a statement of fact, promise, or action which would tend to induce the buyer to make the purchase.

In the case at bar Goerg effectively adopted the manufacturer's warranty. Richards expressed his displeasure with the

houseboat to Goerg upon its arrival at Michigan City. The dealer accordingly worked with the customer in an effort to overcome the obvious defects. After the Fourth of July trip to Starved Rock, Illinois, Richards was satisfied with the vessel sufficiently to succumb to alleged pressure from Ellison to make his final payment. However, this final payment was specifically predicated on the receipt by Richards of the foregoing express warranty. Ellison clearly made this warranty by the manufacturer a part of the bargain upon which he induced Richards to complete the transaction. Under such circumstances where a dealer specifically adopts the warranty of the manufacturer he is bound thereby. *See*: *Courtesy Ford Sales Inc. v. Farrior* (1974), 53 Ala.App. 94, 298 So.2d 26.

Likewise Richards made numerous complaints directly to Kenner. These resulted in Kenner's attempts to rectify the situation. In partial response Kenner eventually issued the express manufacturer's warranty as a condition to final payment. It was part of the consummation of the sale and had the same status for Kenner as it did for Goerg. The existence of the warranty as to both appellees is therefore clear.

■ However, concluding that appellees were bound by certain express warranties does not necessarily mean that the appended disclaimer language is effective as to both of them solely because it was included in the context of the warranty. IC 1971, 26–1–2–313 enumerates the types of express warranties that may be created under the code. Nothing therein suggests that the term "express warranty" encompasses language that excludes warranties, rather express warranties are portrayed as affirmative obligations of the seller. Thus, the use of the term "express warranties" in IC 1971, 26–1–2–317(c) should not be construed as incorporating disclaimer language that happens to appear in the same paragraph. *See*: White and Summers, U.C.C. § 12–7, p. 374, n. 106. Moreover, while IC 1971, 26–1–2–317 on conflict of warranties emphasizes the specific over the general and the express over the implied, such relate solely to

expressions of warranty and not included expressions of disclaimer. IC 1971, 26–1–2–316 strictly construes disclaimers. It follows therefore that to effectuate the language of IC 1971, 26–1–2–316, *supra*, concerning the stricter policy for exclusion or modification, expressions of warranty must be treated as distinct from expressions of disclaimer even if encompassed in the same writing.

■ In this context, concerning an implied warranty of merchantability, this Court in *Woodruff v. Clark County Farm Bureau*, *supra*, held that the disclaiming language in an express warranty which fails to mention merchantability or be conspicuous is insufficient to exclude the implied warranties of merchantability.

The *Woodruff* court stated:

"Disclaimers of implied warranties under § 19–2–316, *supra*, are not favored and are strictly construed against the sellers for reasons of public policy. *Admiral Oasis Hotel Corp. v. Home Gas Industries, Inc.*, (1966), 68 Ill.App.2d 297, 216 N.E.2d 282.

"In order to exclude or modify an implied warranty of merchantability under § 19–2–316(2), . . . the disclaimer 'must mention merchantability' and the written exclusionary language 'must be conspicuous'."

The language in Kenner's express warranty fails to meet these criteria and cannot operate as an effective disclaimer. Furthermore, it should be noted that IC 1971, 26–1–317(c) contains the exception that an express warranty does not displace an inconsistent implied warranty of fitness for a particular purpose.

Finally, IC 1971, 26–1–2–316(1), *supra*, states:

"Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this article [chapter] on parol or extrinsic evidence (section [26–1–]2–202) negation or

limitation is inoperative to the extent that such construction is unreasonable."

The foregoing test of reasonableness which favors warranty over disclaimer requires that the implied warranties of merchantability and the two written express warranties be construed together in so far as they warrant the seaworthiness of the houseboat. The written disclaimers cited are therefore ineffective.

 Having determined the continued existence of an implied warranty of merchantability and having concluded the existence of a material issue of fact as to an implied warranty of fitness for a particular purpose, consideration need be given the separate distinction of whether effective limitations have been placed upon the express warranties.

Limitations contained in the provisions of Kenner's express warranty require that:

"The obligation under this warranty being limited to hull only for repairing or replacing at the factory any part or parts which shall, within 1 year of date of original purchase, be returned to us with transportation charges prepaid and which our examination shall disclose to our satisfaction to have been defective."

The effectiveness of this limitation is raised by Kenner's assertion that Richards failed to return the houseboat to Arkansas, transportation prepaid for repair, before the expiration of its express warranty one year from the date of sale. IC 1971, 26–1–2–719(1) provides in pertinent part:

"(1) Subject to the provisions of subsections (2) and (3) of this section and of the preceding section [26–1–2–718] on liquidation and limitation of damages,

(a) the agreement may provide for remedies in addition to or in substitution for those provided in this article [chapter] and may limit or alter the measure of damages recoverable under this article [chapter], as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of nonconforming goods or parts; and

(b) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

"(2) Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this Act [26–1–1–101—26–1–10–106].

"(3) Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not. [Acts 1963, ch. 317, § 2–719, p. 539.]"

The foregoing allows the parties to contract for remedies "in addition to" or "in substitution for" those normally available under the statute. However, as Official Comment 2 to IC 1971, 26–1–2–719 notes, subsection (1)(b), creates a presumption that clauses prescribing remedies are cumulative rather than exclusive. Thus, unless the parties intend the terms to describe the sole remedy under the contract and such is clearly expressed therein other remedies are still available. Likewise as Official Comment 1 to IC 1971, 26–1–2–719, *supra*, explains it is the very essence of a sales contract that at least minimally adequate remedies be available.

The course of dealing between the parties in the case at bar discloses that the remedy stipulated was not expressly agreed to be the exclusive remedy available. Moreover, if it were considered the sole remedy under that particular warranty several express warranties were made in addition thereto upon which it would have no effect. The characterization of the houseboat as in "excellent condition" with the statement that "the boat has a one year warranty on the hull and [that] the warranty on the engine is still good" were part of the offer to sell taken by Richards to Arkansas. Carver's trip to Michigan City in which he assured

Richards that Kenner would repair the boat to his satisfaction appears from the record to have forestalled Richards' misgivings and potential rejection of the boat as nonconforming. These other express warranties not having been effectively disclaimed, exist along with the limited warranty issued on July 12, 1969. Moreover, no limitation on the remedies available for breach of express warranties was made during the time period when most of the negotiation was done with regard to completing the transaction and curing the alleged defects.

Instead Goerg and Kenner made numerous attempts to rectify defects in the houseboat as if it were under warranty. Assurances were made and additional work was done in Michigan City, Indiana, at the dealer's place of business. Clearly the limitations imposed in the written warranty were never followed. The limitations imposed in Kenner's express warranty cannot therefore be considered exclusive.

Furthermore, whether sufficiently complied with, those express warranties which contained *no* limitations contain questions of fact.

■ The net result is that in addition to the implied warranty of merchantability going to the seaworthiness of the boat and in addition to the factual issues concerning the warranty for a particular purpose, Richards also can raise in a factual context whether the express warranty in the proposition and Carver's assurances were sufficient to give him simultaneous express warranties as well.

Richards actually made only two excursions with the boat. Most of the time during which he had possession was spent attempting to make repairs. Upon its arrival the boat was filled with an estimated 20,000 pounds of water while still on the trailer. The hull was scratched and discolored, doors were warped, mildew was on the carpets, paneling was delaminated, and cracks were in the decks, cabins, and window frames. Much effort was expended by both the dealer and manufacturer in trying to rectify these alleged defects. Limber holes were cut and water was drained. Fuel tanks were repositioned and fiberglass was put over the cracks. Nevertheless, on Richards' trip to Mackinac Island the bow skeleton came loose and one of the four main hull stringers broke.

Under such circumstances whether the various warranties described as having arisen out of the sale were violated presents numerous issues of material fact. These need be decided in the context of an implied warranty of merchantability and a potential implied warranty of fitness for a particular purpose. Moreover, the express warranties involved both written and oral portions. Having decided that the disclaiming language is inoperative and the limitation nonexclusive, only a parol evidence question under IC 1971, .26-1-2-202 (Burns Code Ed.) would inhibit the express oral warranty made by Carver. Yet even in this regard the course of dealing between the parties and the prior written express warranties in the proposition militate against a conclusion that the writing of July 12, 1969, was "intended . . . as a complete and exclusive statement of the terms of the agreement" negating the express warranty in the proposition.[5]

■ Finally, the remedies available to Richards should liability be found are not precluded by appellees' assertion that there was no timely rejection pursuant to IC 1971, 26-1-2-601 (Burns Code Ed.) and IC 1971, 26-1-2-602 (Burns Code Ed.) or revo-

---

5. IC 1971, 26-1-2-202 (Burns Code Ed.) states:

"Final written expression—Parol or extrinsic evidence.—Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented.

(a) by course of dealing or usage of trade (section [26-1-]1-205) or by course of performance (section [26-1-]2-208); and
(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement."

cation of acceptance pursuant to IC 1971, 26–1–2–608 (Burns Code Ed.).

IC 1971, 26–1–2–714 provides:

"Buyer's damages for breach in regard to accepted goods.—(1) Where the buyer has accepted goods and given notification (subsection (2) of section [26–1]2–607) he may recover as damages for any nonconformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable.

"(2) The measure of damages for breach of warranty is the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.

"(3) In a proper case any incidental and consequential damages under the next section may also be recovered."

As noted in the Official Comment 1 this section deals with the remedies available to the buyer after the goods have been accepted and the time for revocation of acceptance has gone by. Thus, only buyers who have accepted and neither rejected nor revoked can avail themselves of the remedy in IC 1971, 26–1–2–714, *supra*. Richards falls within this category. *See*: Annot., 17 A.L.R.3d 1010, § 47, at 1119 (1968). Moreover, Richards clearly complied with IC 1971, 26–1–2–607, *supra*, when he continually complained, paid under protest, wrote the manufacturer and notified the dealer concerning all the defects he considered nonconforming and thereafter returned the boat at the end of the season. Appellees' contentions about revocation of acceptance and notice must therefore fail. *See*: *J. I. Case Company v. Boothe* (1956), 227 Ark. 69, 296 S.W.2d 894.

For each of the foregoing reasons the case is herewith remanded for trial on the issues.

Judgment reversed and remanded.

STATON, J., and ROBERTSON, J., participating by designation, concur.