BEDFORD RECYCLING, INC., Appellant–Plaintiff,

v.

U.S. GRANULES CORPORATION, Appellee–Defendant.

No. 50A04–9308–CV–283.

Court of Appeals of Indiana, Fourth District.

June 7, 1994.

Roy D. Burbrink, Stevens, Travis, Fortin, Lukenbill & Burbrink, Plymouth, for appellant.

James N. Clevenger, Kizer & Neu, Plymouth, for appellee.

RILEY, Judge.

### STATEMENT OF THE CASE

Plaintiff–Appellant Bedford Recycling, Inc. (Bedford) appeals from the adverse judgment on its breach of contract claim against Defendant–Appellee U.S. Granules Corporation (Granules) and the judgment in favor of Granules on its counterclaim.

We affirm.

### ISSUES

Bedford raises eight issues for our review. We consolidate and restate them as follows:

1. Whether Granules had a legal justification for avoiding performance under the contract.

2. Whether the trial court erred when it awarded damages to Granules on its counterclaim and denied damages to Bedford on its complaint.

### FACTS AND PROCEDURAL HISTORY[1]

In the Spring of 1988, both Bedford and Granules independently learned of an upcoming sale of scrap materials to be conducted by the Department of Defense Reutilization and Marketing Service. The sale included certain aluminum boring and turnings which were stored at Crane Naval Weapons Support Center (Crane). Both parties submitted bids for the purchase of the material, and Bedford was the eventual successful bidder.

After notice that Bedford was the successful bidder, Robert D. Beiter as a representative of Granules initiated negotiations on behalf of Granules for the purchase of the aluminum scrap boring and turnings from Bedford.[2] A meeting was eventually arranged on June 14, 1988, at Bedford. After Parsons showed no interest in selling the aluminum scrap to Granules, Beiter left. La-

---

1. Appellant's statement of facts does not follow a narrative format as required by Ind.Appellate Rule 8.3(A)(5). This court has repeatedly stated that a statement of facts should be a concise narrative stated in the light most favorable to the judgment. *Nehi Beverage Co. v. Petri* (1989), Ind.App., 537 N.E.2d 78, 82, *trans. denied.*

2. The first communications between the parties consisted of telephone conversations initiated by Beiter, Product Manager of Granules, to Larry Parsons, Chief Executive Officer of Bedford.

ter that night, Beiter made a purchase offer to Parsons of $0.54 per pound, which offer Parsons rejected. The next day, June 15, 1988, Parsons and Beiter had further communication at which time Parsons accepted Granules' offer of $0.54 per pound but only agreed to sell· half of the scrap materials which were located at Crane. The other half of the materials had been transported from Crane to Needmore Processing, Inc. by Bedford's hauler. Thus at this time, Bedford did not wish to sell the portion of the materials already transported to Needmore. However, later on June 15, Parsons agreed to sell Granules the materials that had already been transported from Crane to Needmore.[3] The agreement was memorialized in a June 15, letter from Granules to Bedford. Enclosed was payment of $30,240.00 for the 56,000 pounds of aluminum material located at Crane. The agreement regarding the second half of the material which had been transported to Needmore was also addressed in the letter.

Immediately thereafter, both parties began performance of their respective promises under the contract. Parsons, having completed the remaining payment obligation to the United States Government, released to Granules the materials located at Crane. Granules had commenced its performance of payment obligations with the check enclosed in the letter of confirmation. Over the weekend Granules began transporting the materials to its Plymouth, Indiana, plant and began processing.[4] Granules contends that of the two loads that were delivered the materials were heavily oxidized.

On Monday morning, a representative of Granules at the direction of the owner of Granules, telephoned Parsons at Bedford and advised him that Granules was rejecting the goods because they were highly oxidized.

Parsons immediately responded that Bedford considered this prospective non-performance by Granules as a breach of contract. This conversation was memorialized in a June 29, 1988, letter from Bedford's local counsel, Mr. Bruce A. Hewetson. Bedford attempted to mitigate damages by processing the remaining materials. On August 10, 1988, Bedford received $21,001.68 from Central Foundry for the remaining processed product.

Bedford initiated its breach of contract action against Granules in January, 1991, seeking damages in the amount of $17,238.72. Granules counterclaimed seeking damages in the amount of $13,703.45. After a bench trial, the trial court found against Bedford on its claim and for Granules on its counterclaim, awarding damages to Granules in the amount of $13,703.45. Bedford appeals. Additional facts will be provided as necessary.

## STANDARD OF REVIEW

■ Because neither party requested special findings of fact and because the trial court did not gratuitously enter such findings, we will review the decision of the trial court under the general judgment standard. Ind.Trial Rule 52(A); *Klebes v. Forest Lake Corp.* (1993), Ind.App., 607 N.E.2d 978, 982, *reh'g denied, trans. denied.* A general judgment will be affirmed if it can be sustained upon any legal theory consistent with the evidence introduced at trial. *Id.* On appeal, we will neither reweigh the evidence nor rejudge the credibility of the witnesses. *Emmons v. Brown* (1992), Ind.App., 600 N.E.2d 133, 134.

## DISCUSSION AND DECISION

I. Rejection/Revocation of Acceptance

We initially note that the transaction at issue involves the sale of goods between merchants.[5] The parties agree that the Uniform

---

**3.** The evidence most favorable to the judgment indicates that the agreement to sell the entire grouping was reached only after Parsons received a telephone call from Needmore Processing to not expect a high recovery from the material. (R. 626). The record further reveals that high oxidation levels in aluminum lead to low recovery.

**4.** The record reveals that the first truckload was taken from Needmore on Sunday, June 19, 1988.

The second truckload was taken from Crane on Monday, June 20, 1988.

**5.** *See* IND.CODE 26–1–2–104 (1993). ("'Between merchants' means in any transaction with respect to which both parties are chargeable with the knowledge or skill of merchants.") I.C. 26–1–2–104(3).

Commercial Code, Article 2 is controlling.[6] We further note that it is undisputed that an agreement was reached whereby Granules agreed to purchase and Bedford agreed to sell aluminum scrap.

Bedford first contends that the trial court erred because it failed to recognize the existence of a valid contract between the parties and the subsequent breach by Granules. As we see it, the existence of a valid contract is not in dispute. Rather, the disputed issue is whether Granules had a legal justification for avoiding performance under the agreement.

■ Granules argues that it made either a valid rejection or revocation of acceptance of the goods. The Code provides that Granules, as buyer, had the right upon delivery of the material either to reject all of it, accept all of it, or accept any commercial unit or units and reject the rest "if the goods or the tender of delivery fail[ed] in any respect to conform to the contract." I.C. 26–1–2–601 (1993). The Code further provides as follows:

(1) Rejection of goods must be within a reasonable time after their delivery or tender. It is ineffective unless the buyer seasonably notifies the seller.

(2) Subject to the provisions of the sections on rejected goods (citations omitted):

(a) after rejection, any exercise of ownership by the buyer with respect to any commercial unit is wrongful as against the seller; and

(b) if the buyer has before rejection taken physical possession of goods in which he does not have a security interest ... he is under a duty after rejection to hold them with reasonable care at the seller's disposition for a time sufficient to permit the seller to remove them; but

(c) the buyer has no further obligations with regard to goods rightfully rejected.

(3) The seller's rights with respect to goods wrongfully rejected are governed by the provisions of I.C. 26–1–2–703 on seller's remedies in general.

I.C. 26–1–2–602 (1993). The Code provision on revocation of acceptance provides as follows:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it.

(3) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

I.C. 26–1–2–608 (1988).

The first requirement for a valid rejection or revocation of acceptance is that the goods be "non-conforming." The Code defines conforming goods as goods that are "in accordance with the obligations under the contract." I.C. 26–1–2–106(2). The question then is whether there was a "non-conformity" within the meaning of the Code upon which to premise a rejection, or alternatively a revocation of acceptance. Granules contends that the tendered material was aluminum oxide rather than the reactive metal aluminum material contemplated by the agreement.

It is clearly stated in section 608 that revocation of acceptance applies where the non-conformity substantially impairs the value of the goods to the buyer. The test then "is not what the seller had reason to know at the time of contracting; the question is whether the non-conformity is such as will in fact cause a substantial impairment of value

to the buyer though the seller had no advance knowledge as to the buyer's particular circumstances." Official Comment 2. Thus, Granules argues that Bedford's knowledge of Granules' need for reactive metal prior to the agreement is unnecessary. Bedford contends that the rejection/revocation of acceptance theory is without merit because "a buyer cannot prove a non-conformity if there was no communication of conformity standards." Appellant's Reply Brief at 13.

The burden of proof is unambiguously on the buyer to establish breach after acceptance. I.C. 26–1–2–607(4); *McClure Oil v. Murray Equipment, Inc.* (1987), Ind.App., 515 N.E.2d 546, 553, *reh'g denied.* The record reveals that Granules had a specific need for aluminum scrap material in order to manufacture aluminum and sell it to a manufacturer of ammonium nitrate fuel oil, an explosive. Beiter concedes that at no time did he ever express to Parsons any quality specifications necessary for Granules to accept the goods. The parties never discussed recovery rates either. Beiter testified that with the benefit of hindsight, he wishes he had expressed a quality standard to Parsons regarding the scrap. However, he further testifies that he would not expect someone in the scrap business to deliver corroded material, i.e. aluminum oxide, when the buyer was unambiguously seeking aluminum material.

Because arrangements for pickup from Crane were unsuccessful, the first truckload was taken from Needmore to Granules and processed on Sunday, June 19, 1988.

Randall Dills, the second shift production supervisor, processed the material as instructed. Dills testified that approximately 9,000 pounds of dust was produced due to the heavy oxidation of the material. He further testified that the normal amount of dust is approximately 2,000 to 2,500 pounds. John Oliver, President and CEO of Granules visited the plant on Sunday and witnessed that the material was severely oxidized and the entire processing site was covered with dust. Oliver ordered the remainder of the load to be run. On Monday morning, June 20, Oliver contacted his manager of materials, Carol Kepler, and instructed her to stop delivery on all material and inform the supplier that the material was severely oxidized and Granules would not accept any more of it. Kepler was not successful in stopping all deliveries because the second truckload had already left Crane and was on its way. The second load was run upon Parsons request.[7] The results were identical to the first run. Oliver testified that he clearly informed Bedford's attorney that Granules was rejecting any further deliveries because the material was deteriorated.

Upon review of the record we find that sufficient evidence exists to support the trial court's finding of the existence of a nonconformity. Granules satisfied its burden of proving that the highly oxidized condition of the material resulted in substantial impairment of value to Granules to warrant revocation of acceptance/rejection. Thus, the trial court's decision is supported by the evidence.[8]

7. Apparently, Kepler informed Oliver that the first load was from Needmore and the second load was from Crane. Since the loads were from different locations, Parsons persuaded Oliver to run the second load to see if it would yield more favorable results.

8. Bedford also contends that the trial court erred when it failed to find that Granules' prior inspection, prior testing, and assumption of the risk by going forward with the purchase of the goods negated any implied warranty. Appellant's Brief at 31–37. Bedford further contends that the "entire defense by [Granules], structured upon the allegedly 'implied warranty of fitness for a particular purpose', must collapse when that structure's underpinnings of 'reliance' and 'communication' are found to be untenable." Appellant's Brief at 37. The implied warranty of fitness for a particular purpose arises

[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is ... an implied warranty that the goods shall be fit for such purpose.

I.C. 26–1–2–315 (1993). Granules argued at trial that an implied warranty of fitness for a particular purpose existed and that Bedford breached that warranty. Having found that the trial court's judgment in favor of Granules can be sustained on the rejection/revocation of acceptance theory, we need not reach the implied warranty issue. Granules also raises a rescission/mutual mistake of fact theory in its brief. This theory was not raised before the close of the evidence at trial, but only briefly alluded to in Granules' written final argument submitted to the trial court. The parties agreed to final argu-

## II. Damages

Having found that the trial court did not err in denying relief on Bedford's complaint or in granting relief on Granules' counterclaim, we next consider the propriety of the court's award of damages. The trial court awarded Granules the $13,703.45 that it requested in its counterclaim. Bedford contends that the trial court erred by failing to award damages and prejudgment interest to Bedford, failing to consider Bedford's efforts to mitigate damages and awarding $13,703.45 to Granules on its counterclaim.

Since we find that Granules had a legal justification for avoiding performance under the contract, we need not consider the damages Bedford would have been entitled had Granules breached the contract. Similarly, Bedford's argument on prejudgment interest is equally irrelevant. In fact, any discussion regarding Bedford's measure of damages is irrelevant.

■ With regard to Bedford's alleged steps to mitigate damages, upon learning that Granules did not intend to complete the contract, Parsons made arrangements with Buck Construction Company to pick up the balance of the material at Crane and deliver it to Needmore for processing. Bedford incurred processing expenses and hauling expenses. Bedford then sold the finished product to Central Foundry Division, General Motors of Bedford, Indiana. Essentially, Bedford contends that the trial court failed to acknowledge its attempts to mitigate damages. The doctrine of mitigation involves the efforts of the non-breaching party to decrease the damages caused by the breach. *Salem Community School Corporation v. Richman* (1980), Ind.App., 406 N.E.2d 269, 275, *reh'g denied.* However, since Granules is found to be the non-breaching party, this argument is misguided and without merit.

■ Finally, Bedford argues that the trial court erred in awarding judgment on

Granules' counterclaim. We disagree. Unless based on insufficient evidence or contrary to law, the computation of damages is a matter within the trial court's sound discretion. *Id.* at 275. Having found that the tendered goods were non-conforming, and Granules was justified in avoiding performance under the contract, we conclude that Granules was entitled to recover damages under the Code. The judgment in favor of Granules on its counterclaim is supported by sufficient evidence.

## CONCLUSION

Based on the foregoing, we conclude that Granules was justified in avoiding performance under the contract due to the nonconformity of the goods. We further find that the judgment in favor of Granules on its counterclaim is supported by sufficient evidence. The trial court is therefore affirmed in all respects.

MILLER, J., concurs.

SULLIVAN, J., dissents with separate opinion.

SULLIVAN, Judge, dissenting.

Granules bid on the very goods it subsequently rejected and the bid submitted to the Department of Defense was in competition with Bedford. Bedford won the bid and purchased the goods from the Department of Defense. Granules had access to the goods before entering into the contract with Bedford. Granules did in fact test the aluminum scrap before embarking upon performance by accepting delivery of a portion of the goods. This access and testing negates any possible claim by Granules of an implied warranty of fitness for Granules' particular purpose. *Richards v. Goerg Boat & Motors, Inc.* (1979) 3d Dist., 179 Ind.App. 102, 384 N.E.2d 1084.

---

ment by simultaneous briefing and therefore Bedford did not have an opportunity to object to this new theory until appeal. Since we affirm the trial court on another theory, we need not reach this new theory advanced by Granules. However, notwithstanding that fact we feel constrained to point out that since this defense

played no part in the trial level litigation it cannot be raised for the first time on appeal. *W & W Equipment Co., Inc. v. Mink* (1991), Ind.App., 568 N.E.2d 564, 577, *reh'g denied, trans. denied* (party who raises an issue on appeal that was not raised in the trial court waives that issue).

Granules' contemplation that the goods would be adequate for its purpose was a unilateral expectation. The contract did not contain or contemplate any specifications or recovery level requirements. The goods did not "fail to conform" to the contract as freely entered into by both parties. Accordingly, I.C. 26–1–2–601 which gives a purchaser the right to reject non-conforming goods is wholly inapplicable.

The goods in this case are totally unlike the goods involved in *Jones v. Abriani* (1976) 1st Dist., 169 Ind.App. 556, 350 N.E.2d 635, relied upon by Granules. In that case, there was an express contractual warranty that the mobile home bargained for would be "identical with the model home" the purchasers had viewed. 350 N.E.2d at 639. When delivered, the mobile home was totally unlike the model home. The quality of the construction and furnishings was decidedly inferior. The sellers continued to assure that they would cure the defects but failed to do so. Our First District understandably held that revocation of acceptance by the buyers was an appropriate remedy.

I would reverse the judgment and remand with instructions to enter judgment for Bedford upon Granules' counterclaim, to enter judgment in favor of Bedford upon its complaint, and to fix the amount of damages which will fully compensate Bedford for the breach of the contract.