**GENERAL FOODS CORPORATION, Plaintiff-Appellant,**

v.

**VALLEY LEA DAIRIES, INC. and Lyons Creamery Cooperative Association, Defendants-Appellees.**

**No. 84–2625.**

United States Court of Appeals, Seventh Circuit.

Argued May 20, 1985.

Decided Aug. 30, 1985.

Rehearing Denied Oct. 10, 1985.

---

Hugh E. Reynolds, Jr., Indianapolis, Ind., for plaintiff-appellant.

James H. Pankow, Arthur A. May, South Bend, Ind., for defendants-appellees.

Before BAUER and EASTERBROOK, Circuit Judges, and CAMPBELL, Senior District Judge.*

WILLIAM J. CAMPBELL, Senior District Judge.

This case centers around a commercial transaction involving three parties: plaintiff, General Foods Corporation (General Foods), and co-defendants, Valley Lea Dairies, Inc. (Valley Lea) and Lyons Creamery Cooperative Association (Lyons). On appeal the case primarily addresses the issue of when liability for defects in a product can shift from seller to buyer or, more specifically, when an implied warranty for merchantability attached to a seller's product can yield to the doctrine of incurred risk due to conduct on the part of the

---

* The Honorable William J. Campbell, Senior District Judge of the Northern District of Illinois, is sitting by designation.

buyer, shifting liability from seller to buyer.

On November 8, 1978 General Foods purchased 40,000 pounds of roller whole dry milk from Valley Lea and Lyons. Valley Lea is a cooperative dairy association located in South Bend, Indiana. Lyons, now defunct, was a member of the Valley Lea Cooperative. Lyons produced the roller whole dry milk purchased by General Foods (through Valley Lea) and delivered the product to General Foods by truck on December 18, 1978. This shipment was labeled "R33250" and divided into nine "lots" containing 25–50 bags per lot. General Foods has an expressly stated policy which it distributes to its suppliers of roller whole dried milk. It is entitled "Supply of Microbiologically Sensitive Food Ingredients." The policy states the vendor must certify its product is manufactured under appropriate sanitary conditions in conformance with federal regulations. With milk-based products such certification is accomplished by the conducting of certain tests which ascertain levels of mold, yeast, streptococcus, salmonella and other microbiological "attributes" associated with the product. Prior to shipment Valley Lea tested its product according to General Foods' policy specifications. The tests proved negative. However, General Foods' stated policy also reserves the right to perform its own tests upon receipt of such products and accept or reject the product based on its own test results:

### ARTICLE II—RECORDS

Analyses made by the vendor shall be forwarded in advance of/or with the shipments to the recipient plant Quality Assurance and Quality Control Managers. A minimum of three samples per lot is required for Salmonella. *General Foods will sample at a rate higher then [sic] the minimum and accept or reject based on these results.* General Foods Appendix p. 82 (emphasis added).

General Foods did its own testing of the co-defendants' shipment # R33250 several days after its receipt. One of the nine lots proved positive for salmonella, a potentially lethal bacterial contaminant found in milk products. General Foods rejected the contaminated lot.

Having found one contaminated lot in shipment # R33250 General Foods had an internal policy decision to make. The shipment had become suspect. General Foods decided the remaining lots would be tested for contaminants at heightened levels, the results of which would provide for a 95% "confidence level" (meaning less than a 5% chance of defect). General Foods tested the remaining samples at this heightened level and the tests proved negative. General Foods decided to release the remaining lots into its milk chocolate production channels. General Foods claims the following factors induced it to release the remaining lots: Lyons' previously unblemished history, no suggestion of possible contamination by Valley Lea, Valley Lea's approval of General Foods' testing plan, customer needs and the 95% confidence level in the final testing of the product.

After milk chocolate had been produced from the roller whole dried milk General Foods took samples of the chocolate for testing. Before the test results were available General Foods shipped the chocolate to two of its customers, Elmer Candy and Frankford Candy. Several days later, General Foods discovered salmonella contamination in the samples from the chocolate it had shipped. As a result the Elmer and Frankford Candy companies incurred hundreds of thousands of dollars worth of losses. Importantly, none of the contaminated chocolate reached the retail level.

General Foods settled its affairs with the two candy companies out of court. In July of 1981 General Foods brought suit in the United States District Court for the Northern District of Indiana against Valley Lea and Lyons. The allegations from that suit brought on appeal are breach of express and implied warranties. At the district court level General Foods sought to be indemnified for its settlement agreements with Elmer Candy (for $300,000) and with Frankford Candy (for $208,000). General

Foods also sought recovery of its own direct damages it calculated to be in the amount of $688,391.13, plus reasonable attorneys' fees. A jury trial was held and a verdict rendered for co-defendants, Valley Lea and Lyons. The jury believed General Foods incurred the risk of loss by using the suspect shipment rather than rejecting the shipment, as it was entitled to do. General Foods received nothing and was directed to cover the defense costs of the co-defendants.

On appeal General Foods claims several jury instructions given by Judge Allen Sharp were erroneous and reversible error. Primarily, General Foods claims Judge Sharp's jury instructions concerning the doctrine of incurred risk were erroneous. General Foods claims according to Indiana caselaw the trial court erred on instructing when the incurred risk defense should be attached. General Foods claims if the appropriate law were applied in this case, co-defendants' implied warranty of merchantability attached to its product would have allowed General Foods to recoup its losses. General Foods has also advanced several additional arguments which will be discussed below as they were raised. General Foods has asked for a new trial on appeal. For the reasons set forth below, its request is denied and the order of the district court is affirmed.

■ General Foods claims jury instruction No. 27 (see Appendix No. 1) set forth inaccurate legal standards on the doctrine of incurred risk which confused the jury and prejudiced its case, causing reversible error. The lead case on the doctrine of incurred risk in Indiana cited by all parties is *Kroger Co. v. Haun*, 177 Ind.App. 403, 379 N.E.2d 1004 (1978). Several principles are established in the *Kroger* case:

"The doctrine of incurred risk is based upon the proposition that one incurs all the ordinary and usual risks of an act upon which he voluntarily enters, so long as those risks are known and understood by him ...

Incurred risk demands a subjective analysis with inquiry into the particular actor's knowledge and voluntary acceptance of the risk. Contributory negligence contemplates an objective standard for the determination whether a reasonable man would have acted under similar circumstances.

Incurred risk is concerned with the perception and voluntariness of a risk and is blind as to the reasonableness of risk acceptance.

Incurred risk involves a mental state of 'venturousness' while contributory negligence ... describes conduct which is 'careless'." *Id.* 379 N.E.2d at 1008.

We believe jury instruction No. 27 accurately set forth the current Indiana law on the incurred risk doctrine. Indeed, the jury instruction employs much of the same language used in the *Kroger* case in describing the elements of the incurred risk doctrine. General Foods claims the failure of the court to define the word "risk" confused the jury and "supports the notion that general knowledge of a possible risk is sufficient to support the defense of incurred risk." Yet General Foods advances no legal authority which supports its conclusion that defining the word "risk" is necessary for a fair jury instruction.

■ General Foods further claims the first paragraph of instruction No. 27 amounted to a mandatory instruction. General Foods again believes the paragraph forces a jury to conclude if General Foods merely knew of a risk, the defense of incurred risk was proved. We find nothing in the language of paragraph one which substantiates such an argument. The language instructs the jury "should you find" General Foods knew of the risk of contamination, General Foods "may" have incurred the risk of any damage it suffered. General Foods' assertion that this language directs a verdict for Valley Lea because there was always a risk of contamination is unpersuasive. The first paragraph of the instruction leads a jury to conclude the incurred risk doctrine is capable of being invoked in this case, not necessarily to be invoked. General Foods claims the court erred when it stated in its instruc-

tion the defense of incurred risk is available to Valley Lea if General Foods knew of a danger and proceeded *unreasonably* to use the product. General Foods claims its decision did not have to be unreasonable. General Foods correctly states from *Kroger* incurred risk "is blind as to the reasonableness of risk acceptance." Yet with this in mind the district court's statement General Foods had to proceed unreasonably in encountering the known risk could only have helped General Foods and placed a greater burden of proof on Valley Lea. Hence no harmful, prejudicial error occurred to General Foods when the court required the jury to find General Foods' conduct unreasonable before the defense of incurred risk could be applied to its actions.

■ General Foods claims it did not knowingly and voluntarily face a specific (actual) risk and therefore giving the jury an incurred risk instruction was inappropriate. General Foods cites *Power v. Brodie,* 460 N.E.2d 1241 (Ind.App.1984), which states the incurred risk doctrine is a defense for Valley Lea if General Foods had: (1) more than a general awareness of a potential mishap; (2) actual knowledge and voluntary acceptance of the risk; and (3) consciously, deliberately and intentionally embarked upon a course of conduct with knowledge of the circumstances and a mental state of venturousness. See *Power,* 460 N.E.2d at 1243. We believe the jury could have found General Foods to have had the mental state described in *Power, supra* and applied the incurred risk doctrine in this case as a result. Looking at the first prong of the *Power* criteria, General Foods had more than a general awareness of a potential mishap. When part of the shipment at issue was found to be contaminated with salmonella General Foods had the right to reject the entire shipment at a point before it incurred losses. Yet General Foods never attempted to return the remainder of the suspect shipment and it was General Foods' own decision that the remainder of the shipment could be used after being cleared by further in-house testing. As for the second prong of the *Power* criteria, General Foods had actual knowledge and voluntarily accepted the risk. It is true, as General Foods asserts, it did not have actual knowledge of a defect in the remainder of the shipment. However, this misses the point. The key point is that General Foods had actual knowledge the product could be contaminated, having already found one bad lot. If General Foods had to have knowledge of a defect for the doctrine of incurred risk to be implied, the doctrine could never be applied for there would be no risk involved.

General Foods decided to use a test which would allow it to be 95% sure the remainder of the product was not contaminated. General Foods depended on the test and consciously and voluntarily decided to incur the small 5% risk involved in a shipment already suspect. If the in-house tests General Foods decided to use had only a 65% or 75% accuracy level perhaps General Foods would have asked Valley Lea for a refund, having already found one contaminated lot. Instead, General Foods depended on a test it knew was not 100% certain. General Foods decided the 95% test was good enough. It is—95% of the time. Finally, it is not incomprehensible a jury would find General Foods' decision to release the finished milk chocolate to the candy companies before further test results on the product were available a good example of the conduct described in the third prong of the *Power* case—conscious, intentional embarkation upon a course of conduct with knowledge of the circumstances and a mental state of venturousness. Risk of salmonella contamination in roller whole dried milk is ever present. General Foods knew the shipment it was dealing with was particularly suspect. In choosing not to wait a few days for the second test results to arrive it adopted a mental state of venturousness and incurred a risk. Surely a jury could apply the incurred risk doctrine to General Foods' actions according to the *Power* criteria.

■ General Foods believes that because the risk was not probable, it was too insignificant to be an incurred risk; that the

incurred risk doctrine can only be employed when there is a probability of harm, not a mere possibility of harm. The triggering factor in employing the incurred risk doctrine is that a risk was known, not what chance there is of the risk being realized. The *Kroger* case does not speak in terms of probabilities. The analysis is not whether there was a 51% chance or a 5% chance the risk would be realized but merely whether there was any risk knowingly understood and voluntarily entered into by the actor. It is the existence of the mental state of the actor that counts, not the probability of the risk being realized. Once the existence of the risk is understood by the actor, whether the doctrine of incurred risk is applied to the actor's subsequent conduct is a question of fact for the jury. See *Power v. Brodie, supra; Kroger Co. v. Haun, supra; Dibortolo v. Metropolitan School District of Washington Township,* 440 N.E.2d 506, 511 (1982); *Moore v. Federal Pacific Electric Company,* 402 N.E.2d 1291, 1993 (1980).

As the *Kroger* case points out:

"Whether a user has assumed the risk of using a product ... is fundamentally a subjective test, in the sense that it is *his* knowledge, understanding and appreciation of the danger which must be assessed, rather than that of the reasonably prudent person ... this is a question to be determined by the jury. That determination is not to be made solely on the basis of the user's own statements but rather upon the jury's assessment of all the facts established by the evidence. No juror is compelled by the subjective nature of this test to accept a user's testimony that he was unaware of the danger, if, in the light of all the evidence, he could not have been unaware of the hazard; and the factors of the user's age, experience, knowledge and understanding, as well as the obviousness of the defect and the danger it poses, will all be relevant to the jury's determination of the issue, if raised." (original emphasis) *Kroger* at 379 N.E.2d at 1009, citing *Williams v. Brown Manufactur-*

*ing Co.,* 45 Ill.2d 418, 261 N.E.2d 305, 312 (1970).

General Foods' assertion that it was faced with too small or too slight a possibility of harm to trigger the incurred risk doctrine is not an appropriate conclusion for it—or this court—to make. Having already decided the elements of the doctrine of incurred risk were accurately enunciated by the trial court, it is well established that whether the doctrine should in fact be applied to General Foods' actions/conduct is a question of fact for the jury. We see no compelling reason to reverse the jury's conclusion on the matter and reject General Foods' argument there was error in the formation and application of instruction No. 27.

■ General Foods' objection to instruction No. 50 (see Appendix No. 2) is a continuation of its argument that there had to be a probability of a risk of contamination for the doctrine of incurred risk to be employed. For reasons expressed above we conclude this argument is unpersuasive. The court also finds General Foods' proposed instruction No. 50 inappropriate. Once again, the issue when employing the incurred risk doctrine is not whether the risk was probable or possible, or unreasonable versus reasonable, but merely whether the risk was present and whether General Foods knowingly and voluntarily incurred the risk when it had other alternatives. General Foods also believes instruction No. 50 mandatory. We find nothing in the language of No. 50 mandatory. The instruction tells the jury "if you find" then losses "may not have been proximately caused." We find nothing mandatory about such language.

■ As part of its argument concerning instruction No. 50, General Foods inserts the argument that codefendants breached an express warranty created in the original purchase order between the parties. The purchase order had the following statement:

Conformity with the General Foods' Policy on the Supply of Sensitive Food Ingredients and Microbiological Specifi-

cations Group 1 are hereby made a part of the requirements of this order.

Assuming *arguendo* there was an express warranty here (General Foods can only assert the above statement "amounted to" an express warranty), it was waived when General Foods tested lot # 329, found it was defective and failed to return the remainder of the shipment at this point claiming violation of the warranty. As stated earlier, the risk of salmonella contamination is ever present. Valley Lea claims it tested according to General Foods' specifications before the shipment left the plant and the tests proved negative. General Foods tested the remaining lots at a 95% confidence level and the tests at this level proved negative. If salmonella contamination is an ever present risk, when does the producer's liability end concerning this risk? Certainly not after a significant lapse of time, such as when General Foods had already tested the product according to its specifications and decided to release the product into milk chocolate and sell it to customers.

We find nothing mandatory in instruction No. 56 (see Appendix No. 3). We believe the language in the instruction such that the jury was given sufficient latitude to determine the proximate cause issue addressed here accurately and fairly. We do not believe the court instructed the jury there was a risk. We do not find other theories General Foods advanced precluded or prejudiced by the instruction.

■ We also believe the legal standards set forth in instruction No. 48 (see Appendix No. 4) were accurate. It was up to the jury to decide whether the doctrine of implied warranty of fitness for a particular purpose applied to the facts in this case. General Foods asserts the district court erred in suggesting General Foods' testing procedures relieved co-defendants from any warranty that may have existed. Yet the tests conducted by General Foods would be the factor that would negate the reliance necessary for the implied warranty for a particular purpose to apply here. This is because a jury could find General Foods relied upon its own skill and judgment through its own in-house testing in determining whether the shipment should be used, especially after it had found one contaminated lot. Having found the legal standards set forth in the jury instruction accurate, we see no reason to upset the jury's finding that the implied warranty for fitness for a particular purpose is not applicable in this case.

■ We see nothing wrong with instruction No. 52 (see Appendix No. 5). We believe the jury could have found a course of dealing or performance between the parties in this case. Indeed General Foods' carefully-delineated "Policy on Supply of Microbiologically Sensitive Food Ingredients," which established its in-house testing procedure and right of rejection of a received product, could have led a jury to believe an implied warranty of merchantability was modified/excluded by the parties' course of dealing. The law in instruction No. 52 is not inapplicable to the evidence as General Foods asserts.

■ We see no prejudicial error in instruction No. 44 (see Appendix No. 6). General Foods claims the instruction too wide-ranging and not supportive of the evidence of this case. Yet General Foods did have continuous business dealings with the co-defendants for many years before events pursuant to the current dispute arose. Ascertaining the existence and scope of an express warranty in this case is not as clear-cut as General Foods would lead us to believe. Instruction No. 44 sets forth appropriate criteria which a jury could use in finding whether any express warranties created between the parties were negated by a pattern of conduct over the years. We see no error here. We also find no reversible error surrounding Valley Lea's comments on General Foods' size during closing argument. The jurors were well aware General Foods is one of America's corporate giants and that the co-defendants were smaller in size. General Foods fails to convince us Valley Lea's statements were news to the jurors. We remain unconvinced the references to Gen-

eral Foods' size were irrationally seized upon by the jury in reaching its verdict.

For the reasaons set forth above, the judgment of the district court is affirmed.

## APPENDIX NO. 1

### COURT INSTRUCTION NO. 27

Should you find by a fair preponderance of all of the evidence that General Foods Corporation knew and understood the risk of salmonella contamination in the lots of milk from Valley Lea Dairies, Inc. and voluntarily released said milk into production of milk chocolate, then General Foods Corporation may have incurred the risk of any damage that it may suffer or sustain by any such voluntary conduct and cannot recover from the defendants in this case.

The defense of incurred risk is available as a defense to a breach of warranty if supported by the evidence. This defense arises if the user, in this case General Foods, actually knew of the danger and nevertheless proceeded unreasonably to use the salmonella contaminated dry milk in the manufacture of milk chocolate and was injured by it. This action must be conscious, deliberate and intentional. The burden of proof on this defense is on the defendants.

## APPENDIX NO. 2

### COURT INSTRUCTION NO. 50

If you find that General Foods Corporation discovered salmonella contamination in part of the shipment pursuant to purchase order number R33250 and knew and understood the risk of salmonella contamination in that part of the lots being released into production of chocolate, or in the alternative if you find that it was unreasonable for General Foods Corporation to release the milk into production knowing the possibility of salmonella contamination, then the losses sustained by General Foods Corporation may not have been proximately caused by any breach of warranty and any consequential damages may not be awarded.

### PLAINTIFF'S PROFERRED INSTRUCTION NO. 50

The defense of incurred risk arises only when there is a specific risk of which the party who is later injured knows and said party proceeds voluntarily to expose itself to that risk. The general risk that there might be salmonella contamination and the fact that this general risk would be known to General Foods would not, in and of itself, constitute an incurred risk if General Foods used roller whole dry milk with that knowledge. *Rather, it would require the specialized knowledge of General Foods of this particular roller whole dry milk that it used after rejecting lot 329 which was contaminated or the knowledge of General Foods that it was probably contaminated.*

## APPENDIX NO. 3

### COURT INSTRUCTION NO. 56

If you find the sole proximate cause of any of the claimed damages of General Foods Corporation to be due to its own internal decisions to take the risk of running production with the lots of milk in which it found salmonella upon sampling, and you further find that General Foods Corporation relied on its own expertise and knowledge in connection with the facts entering into that judgment, then you may not award damages to General Foods Corporation against Lyons Co-Operative Creamery Company or Valley Lea Dairies, Inc. for such damages.

## APPENDIX NO. 4

### COURT INSTRUCTION NO. 48

Should you find from the evidence that General Foods Corporation in deciding whether to accept or reject the lots of roller whole dry milk relied on their own testing of the roller whole dry milk, then there may not be created any implied warranty of fitness for a particular purpose between General Foods Corporation and Valley Lea Dairies, Inc.

APPENDIX NO. 5

## COURT INSTRUCTION NO. 52

An implied warranty of merchantability may be modified or excluded on the course of dealing between the parties or the course of performance or useage of trade. So in this case should you find that during the course of dealing or the course of performance between the parties excluded or modified the implied warranty of merchantability to the extent that the milk in question would only be expected to meet the testing requirements of General Foods Corporation then there may not exist any implied warranty of merchantability between General Foods Corporation and Valley Lea Dairies, Inc.

## APPENDIX NO. 6

### COURT INSTRUCTION NO. 44

This case involved a series of sales transactions between the same parties over a number of years. The situations of the parties, their knowledge, experience and reliance may be expected to change in light of their experience during that period of time. In determining whether or not an express warranty was created in this case, it must be determined on the basis of the parties, their knowledge, experience and reliance which existed as of the date of the purchase order issued by General Foods Corporation number R33250.

EASTERBROOK, Circuit Judge, dissenting.

The risk that a dairy product will contain salmonella is one of the constants of the business. The risk will vary with the care the participants in the process take. The contract in this case required the sellers (collectively Valley Lea) to take scrupulous care when processing the milk. In order to protect itself from a number of risks—the risk that Valley Lea would fail to take the necessary precautions, the risk that some contamination would enter the milk in the drying process, and the risk that milk would become contaminated en route— General Foods tested the dry milk before

using it. The instructions in this case permitted the jury to infer from General Foods' knowledge of the general risk of contamination, and from its careful testing, that it "incurred" the risk of contamination and so cannot recover. I believe that the law of Indiana does not permit a jury such latitude. The district court should have given General Foods' proposed instruction No. 50 rather than its own instruction No. 27.

This is a contract case. General Foods seeks damages for breach of warranty. It wants compensation for consequential damages caused by a concealed defect in a product it purchased. We should start with the rules of contract law contained in Indiana's version of the Uniform Commercial Code. The UCC provides that a buyer's acceptance of goods does not alter warranties that apply to the goods, when the defect in the goods is latent. Ind.Code § 26–1–2–316. (I omit the "Ind.Code § 26–1" from other citations to the UCC.) The buyer may recover consequential damages when the seller knows the use to which the goods will be put and the buyer could not reasonably proceed by obtaining some other supplier's products (by "cover"). UCC § 2–715(2)(a). A buyer's inspection does not prevent the buyer from recovering damages caused by latent defects. *Richards v. Goerg Boat & Motors, Inc.*, 179 Ind.App. 102, 384 N.E.2d 1084 (1979). Older cases hold the same. *Rayl v. General Motors Corp.*, 121 Ind.App. 608, 101 N.E.2d 433 (1951) (en banc); *Teter v. Schultz*, 110 Ind.App. 541, 39 N.E.2d 802 (1942); *Bank of Kansas City v. Grindstaff*, 45 Ind. 158 (1873). Under UCC § 2–607(2) the acceptance of goods does not prevent the buyer from recovering damages for the goods' non-conformity to the contract. See also UCC § 2–608(1)(b) and comment 1, which allows the buyer to revoke acceptance belatedly and hold the seller liable. *Hudson v. Dave McIntire Chevrolet, Inc.*, 180 Ind.App. 646, 390 N.E.2d 179 (1979).

The UCC does not refer to "incurred risk." Neither do cases decided under the

UCC. The doctrine is an offshoot of the Restatement (Second) of Torts § 402A, comment n, which states that a user of a defectively designed good may not recover if he is aware of the defect and nonetheless proceeds unreasonably. The doctrine was not designed for contract cases. I recognize that some Indiana cases have applied it in contract cases without any explanation, and that this binds a federal court hearing a diversity case. See *Gregory v. White Truck & Equipment Co.*, 163 Ind. App. 240, 323 N.E.2d 280 (1975). Nonetheless there is no reason why a federal court should extend the doctrine to foreclose liability that would otherwise be supported by principles of contract law.

So far as I can tell from the confusing and internally contradictory cases announcing and applying the doctrine of incurred risk, no court of Indiana has relieved a seller of liability for a *latent* defect. The cases say instead that "incurred risk" is a defense to liability when a person knows a particular risk and acts anyway—a doctrine almost antithetical to avoiding liability on the basis of a latent defect. *Kroger Co. v. Haun*, 177 Ind.App. 403, 379 N.E.2d 1004, 1008 (Ind.App.1978), on which the majority principally relies, states that the doctrine depends on "the perception and voluntariness of a risk and is blind as to the reasonableness of risk acceptance."

All of the cases that have discussed the doctrine involve risks that are apparent. In *Moore v. Moriarty*, 415 N.E.2d 779 (Ind. App.1981), for example, one party was pulling a disabled truck with a tractor, while the other steered the truck. The person in the cab of the truck failed to apply the brakes at the right time, injuring the driver of the tractor. The court thought it inappropriate as a matter of law to apply the doctrine of "incurred risk." One driver could not know that the other would fail to apply the brakes—although he could appreciate the risk that a tow may lead to a mishap. See also, e.g., *Power v. Brodie*, 460 N.E.2d 1241, 1243 (Ind.App.1984), explaining that "incurred risk" requires "much more than the general awareness of a potential for mishap ... [and entails]

acceptance of a specific risk of which the plaintiffs had actual knowledge."

When the defect in a product is latent, the state has declined to apply the doctrine. See *Moore v. Federal Pacific Electric Co.*, 402 N.E.2d 1291 (Ind.App.1980), in which the plaintiff was electrocuted when he put a screwdriver in switchgear that he knew was energized. He knew of the risk of electrocution; he did not know, however, that a defect in the switchgear made the risk higher than he thought. The court held the doctrine of "incurred risk" applicable "only if Moore had actual knowledge of the danger or defect caused by the Defendants" (*Id.* at 1293)—in other words, of the defect in the product's design, not of the general risk of electrocution when you put a screwdriver in a live switch carrying 450 volts.

The sort of risk General Foods understood and accepted here is the sort of risk any user of dairy products understands and accepts—that the product may be contaminated with salmonella. General Foods tried to protect itself from this risk. But it did not accurately understand the degree of risk it faced. Under Indiana law awareness that any product *may* be defective, and the adoption of a plan of testing to reduce the costs of such defects, does not permit a jury to find that the buyer "incurred" the risk. There is no basis for allowing the jury to find "incurred risk" here.

The majority holds that any problem in the first paragraph of the instruction on incurred risk was overcome by the second paragraph, which says that the defense applies if General Foods "actually knew of the danger and proceeded unreasonably" in using the dry milk. The initial question is what "the danger" means—the danger that any dry milk will be contaminated, or some particular level of danger? A subsidiary question is what it means to proceed "unreasonably" in using dry milk.

The contract between General Foods and its suppliers attempted to allocate duties of quality control. Valley Lea undertook to

use the best methods of sanitation and production; General Foods undertook to test the milk before using it. Each party had a duty of care. Because each could contribute to the loss, this made sense. The seller's care reduced the amount of contamination, and the buyer's care reduced the chance that accidentally-contaminated milk would cause loss. If the buyer took no care (for example, skipping the testing) or if the buyer used milk that it thought likely to be contaminated, a jury could find the conduct unreasonable in the sense of tort law. If a person neglects to take precautions that cost less than the injury (if one comes to pass), discounted by the improbability that there will be an injury, that person has behaved unreasonably. *United States Fidelity & Guaranty Co. v. Jadranska Slobodna Plovidba*, 683 F.2d 1022, 1025–26 (7th Cir.1982); *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 (2d Cir.1947) (L. Hand, J.).

General Foods tested the milk so thoroughly that there was less than a one-in-twenty chance that as much as 5% of the powder would contain undetected salmonella contamination. It is difficult to see how using the milk in an ordinary commercial way could be unreasonable even under the tort standard. The loss in this case came to about $1.2 million. If it is appropriate to interpret the results of the testing as putting an upper limit of 5% on the probability of loss, the expected loss from using the milk was less than $60,000 ($1,200,000 × 0.05 = $60,000). The alternative was to leave the plant idle while seeking another source of milk, which could have imposed commercial losses substantially exceeding that sum. (The parties agree that roller dried powdered milk was not readily available, making "cover" difficult.) Perhaps even on these numbers a jury could have found unreasonable conduct if General Foods had mixed Valley Lea's milk with that of another supplier for an unusually large production run, thereby increasing the potential loss, but apparently General Foods did not do this.

As it turns out, the results of the testing were seriously misleading. The testing was based on the assumption that the probability of contamination in any one lot was independent of the probability of contamination in another. General Foods assumed, in other words, that contamination would be accidental rather than systematic. To find salmonella in one lot does not give much information about another, if the contamination was introduced by chance after manufacture. General Foods had every reason to believe that the risks were independent. Its contract called for Valley Lea to use the best sanitary methods and to clean all equipment thoroughly after each lot. This would ensure independence. So far as General Foods knew, there was no history of salmonella contamination at Valley Lea.

General Foods had been lied to. Valley Lea had found contamination before; so had federal inspectors. Valley Lea's officers not only withheld this information from General Foods but also lied when General Foods put the question point blank after finding contamination in lot 329. A memorandum in evidence contains a pledge by officers of Valley Lea to hide the information from General Foods.

Valley Lea also did not routinely clean the equipment after production of each lot, so that contamination might recur. To make matters worse, Valley Lea's equipment had been set up so that a leaky valve allowed unpasteurized milk to enter the finished product. (There is some suggestion that unpasteurized milk was used deliberately in order to increase the capacity of the plant.) This dramatically increased the risk of contamination, and it linked the risk of one shipment with the risk of another. Valley Lea did not inform General Foods about the failure to clean up or the use of unpasteurized milk.

The knowledge that whatever went wrong with lot 329 probably had gone wrong with the other lots in the shipment would have cast new light on the interpretation of the tests. The samples were not independent. General Foods was taking a much bigger risk than it knew. It says,

and Valley Lea does not deny, that it would not have used an ounce of Valley Lea's milk had it known how Valley Lea was operating its plant; it concedes that it would have been unreasonable to use milk after finding the problem in lot 329 if it had known that the risks of the lots were dependent rather than independent. Yet the instruction did not inform the jury of the significance of dependence versus independence to a judgment that General Foods "incurred" a known risk.

There is, perhaps, another sense in which General Foods "incurred" a risk. It specified that the milk was to be roller dried rather than spray dried. All agree that roller dried milk is exposed to the air longer, and so there is a greater risk of contamination at the processing stage. General Foods took this risk because it believes that roller dried milk gives its chocolate a better taste. It might be a sensible interpretation of the contract—of trade practice modifying the written terms—to say that General Foods accepted all of the increased risk that came from selecting the roller drying process. Cf. *Western Industries, Inc. v. Newcor Canada Ltd.*, 739 F.2d 1198 (7th Cir.1984) (discussing modification of warranties through trade custom). General Foods also willingly incurred any risks associated with its own manufacturing processes, which might argument the loss from the occasional inevitable introduction of salmonella. Here, for example, General Foods shipped the chocolate in liquid state before obtaining the results of its final tests for contamination, and a jury might sensibly have charged to General Foods the costs created by this.

But there is no evidence from which a jury could have found that the problem in this case arose from the selection of the roller rather than the spray drying process. The evidence points to either reckless or deliberate conduct at Valley Lea that permitted unpasteurized milk to enter the product. General Foods' specification of roller dried milk did not create *this* risk.

The instructions here were thoroughly unsatisfactory. The jury properly could

have been told that General Foods incurred the risk of roller dried milk, that it incurred the costs of unusual production runs or immediate shipment. It did not, however, incur the risks of loss from unpasteurized milk or uncleaned equipment. It did not know that it was taking these risks, and under Indiana law knowledge of the specific character of the risk is an essential element of the defense. The instructions should have separated the risk of roller dried milk from the risk of other milk, the background risk common to all milk from the risk of unpasteurized milk. They should have informed the jury that it was commercially reasonable to use the milk once the tests came out as they did—unless General Foods knew that the risks were dependent rather than independent.

This is a genuinely hard case, however, because General Foods did not tender instructions that made these distinctions explicitly. In a civil case we cannot fault a judge for failing to invent distinctions that the parties did not incorporate in their proposals.

When each party tenders an incomplete or misleading instruction, the judge must either write a correct instruction or choose the one that comes closer to being right. *Chase v. Consolidated Foods Corp.*, 744 F.2d 566 (7th Cir.1984). General Foods' proposed instruction No. 50 was significantly closer to being right. It would have told the jury that the defense depends on knowledge of a "specific" risk, and that the general risk of salmonella contamination would not be enough. It also required knowledge that the powder was "probably contaminated"—too high a requirement in any test of commercial reasonableness, although arguably justified by the state's unwillingness (so far) to apply the doctrine of incurred risk to latent defects. This proposal was therefore not free from flaw, but it was closer than the nebulous No. 27 that the jury heard.

No. 27 may too easily be read to penalize diligence. If General Foods had simply dumped the powder into its vats without any testing, it would have recovered on its

warranty. The more carefully General Foods tests, the more conscious it is of risks, the less able it is to recover for undetected poison in the food. As a general principle, that must be wrong.